YATES, Presiding Judge,
dissenting.
Because I believe that the trial court abused its discretion in failing to find James Munkus 100% permanently and totally disabled, I must respectfully dissent.
The record indicates that at the time of trial Munkus was 63 years old and had a sixth-grade education. He testified that he has no special technical training and that his work history had consisted primarily of heavy manual-labor jobs. At the time he was injured, Munkus was employed by Watts Construction as a dump-truck driver. He testified that on August 20, 2001, he was cleaning the bed of his truck when the “tailgate came down, grabbed the sleeve of [his] glove and snatched [him] around.” He stated that he felt a “pop” in his neck and shoulder and that he collapsed to his knees.
Munkus was subsequently treated by Dr. George Douthit and Dr. Daniel Ryan for his injuries. Munkus was first seen by Dr. Douthit on September 13, 2001, complaining of pain that radiated down his right arm. Diagnostic testing indicated that Munkus had a possible tear in his rotator cuff and a possible nerve compression in his cervical spine. Dr. Douthit concluded that Munkus’s cervical complaints should be addressed first, and he referred him to his partner, Dr. Ryan.
Munkus was first seen by Dr. Ryan on October 2, 2001, complaining of pain in his right shoulder and arm and finger numbness. An MRI revealed that Munkus had cervical disc herniations at the C5-C6 and C6-C7 levels and that he had significant stenosis at the C4-C5 level. Dr. Ryan rec *550 ommended a cervical discectomy and fusion of the C4-C5, C5-C6, and C6-C7 levels; Dr. Ryan performed the recommended surgery on December 26, 2001. During the surgical procedure, Dr. Ryan removed three cervical discs, which he replaced with a bone graft in order to fuse the vertebrae, and he secured the bone graft with a titanium plate. Following his surgery, Munkus returned to Dr. Ryan on January 3, 2002, and reported that he was still experiencing some numbness in Ms arm and that he was still having shoulder pain related to activity.
Munkus continued to be treated by Dr. Ryan for complaints of numbness and tingling in his right arm. Munkus was referred by Dr. Ryan to physical therapy and work-conditioning programs. Munkus returned to Dr. Ryan on May 23, 2002, complaining of significant neck pain with motion. Dr. Ryan noted that Munkus’s endurance was improving with therapy but that his mechanical symptoms were worsening. Further diagnostic testing indicated that Munkus had a “non-union” of his cervical fusion, and Dr. Ryan recommended a second surgery, which he performed on June 14, 2002.
Munkus returned to Dr. Ryan on October 16, 2002, complaining of a “popping” in his neck with motion and severe pain in the trapezial area, which radiated into both shoulders. Munkus also complained of intermittent spasms and contractions in his right forearm, which Dr. Ryan could not explain but which he did not relate to Munkus’s cervical condition. Dr. Ryan ordered additional diagnostic testing that revealed degenerative changes in Munkus’s cervical spine above and below the fusion but that revealed no additional neurological compromise. Dr. Ryan noted that Munkus’s fusion appeared to be solidifying properly. Dr. Ryan testified that Mun-kus’s cervical fusion will make his cervical spine above and below the fusion more susceptible to degenerative changes. Dr. Ryan further testified that Munkus had suffered at least temporary nerve damage and possibly permanent nerve damage.
Dr. Ryan, on October 31, 2002, returned Munkus to the care of Dr. Douthit for treatment of his shoulder complaints. Dr. Ryan stated that it was his opinion that once Dr. Douthit had determined that Munkus had reached maximum medical improvement regarding his shoulder condition, Munkus should be referred for a functional-capacity evaluation (“FCE”) and returned to work under the appropriate restrictions.
Munkus returned to Dr. Douthit complaining of right shoulder pain. Dr. Douthit recommended arthroscopic surgery, which he performed on November 19, 2002, to repair a partial tear of Munkus’s rotator cuff. Munkus returned to Dr. Douthit on February 13, 2003, and Dr. Douthit noted at that time that Munkus was feeling “much better” and making “improvement with his shoulder.” Dr. Douthit testified that Munkus got a “good result” from the shoulder surgery. Dr. Douthit stated that most of the symptoms that Munkus was experiencing following the shoulder surgery were related to his cervical condition and that he was not experiencing pain from the shoulder condition that alone would prevent him from being able to work.
Munkus underwent a FCE on April 8, 2003, the results of which placed him in the sedentary-work category. Based on the results of the FCE, Munkus was subject to the following permanent restrictions: no working bent over while sitting; no repetitive squatting; no overhead work while in the supine position; no step climbing; no ladder or step climbing; and no crawling. Munkus was restricted to only occasionally working overhead while standing; occasionally working bent over while *551 stooping; and occasionally working while kneeling. Munkus was further limited to only occasionally lifting 16 pounds from floor to waist; occasionally lifting 8 pounds from waist to eye level; occasionally carrying 13 pounds with two hands; and occasionally pushing and pulling 30 pounds. Munkus was not limited in sitting or standing. The FCE indicated that Munkus had reached maximum medical improvement.
Dr. Douthit testified that he agreed with the sedentary-work category and the work restrictions placed upon Munkus by the FCE. He stated that Munkus would be able to work within those restrictions for an eight-hour work day. Dr. Douthit testified that he was no longer prescribing Munkus pain medication. Dr. Ryan testified that the surgery was a success but that Munkus continues to experience pain related to his cervical condition and that there was nothing else that he could do for Munkus at this point. Although Dr. Ryan’s deposition was taken before the FCE was performed, he testified that he felt comfortable with Munkus returning to work within the restrictions set forth in the FCE and stated that, generally, the restrictions imposed pursuant to an FCE tend to be more limiting than the restrictions he would impose. Dr. Ryan testified that he does not believe that Munkus is suffering from pain so severe as to prevent him from returning to work in some capacity. However, Dr. Ryan also stated that Munkus’s educational level could disqualify him from certain jobs that fall within his work restrictions.
Munkus testified that he continues to experience chronic pain and numbness. He stated that he has problems “using” his neck and that he has a limited range of motion in his shoulder. Munkus stated that he frequently sleeps, sits in his lounge chair, and “lay[s] around the house” in order to relieve the pain in his neck and shoulder. He further stated that the pain he experiences causes him to become dizzy. He said that he is no longer able to pursue certain hobbies, including hunting, fishing, swimming, playing music, and carving, because of the pain he experiences.
Both parties presented evidence of Mun-kus’s vocational disability. Munkus was evaluated by Jo H. Spradling, his vocational expert, on April 25, 2003. Spradling noted that Munkus had completed the sixth .grade and that he had no additional education or training. She administered the Wide Range Achievement Test to Munkus, which indicated that Munkus was at a preschool level in reading and arithmetic. Spradling noted that Munkus’s scores demonstrated that he was illiterate. She acknowledged that the FCE results placed Munkus in the sedentary-work category, and she noted that sedentary occupations comprise only 10% of the total jobs found in our economy. She stated that based on Munkus’s education and work history he possesses no skill for vocational alternatives. Spradling concluded that based on Munkus’s educational background, his work history, his documented physical limitations, and his complaints of pain, he is unable to return to gainful employment and is 100% vocationally disabled.
Munkus was evaluated by Eddie Rice, Watts Construction’s vocational expert, on May 6, 2003. Rice noted that Munkus had a sixth-grade education and that he had no additional education or technical training. Rice also administered the Wide Range Achievement Test to Munkus, which indicated that Munkus read and spelled at a first-grade level and performed math at a second-grade level. In formulating his vocational opinion, Rice took into consideration Munkus’s injury, his treatment and outcome, his prognosis and work restrictions, his subjective complaints and physi *552 cal limitations, his employment history, his education and training, his age, his access to occupations, and the FCE results. Rice noted that Munkus is limited to the sedentary-work level and that he is incapable of returning to work as a truck driver. Rice noted that Munkus had suffered a significant but not a complete loss of access to employment, and he stated that Munkus could obtain employment as a dispatcher, a machine tender, or a gate tender. Rice concluded that Munkus had sustained a 62% vocational disability.
Permanent total disability is the inability to perform one’s trade and to find gainful employment. Michelin North America, Inc. v. Hamby, 722 So.2d 770 (Ala.Civ.App. 1998). The court must apply a two-pronged test in determining whether a permanent total disability exists: the employee must be incapable of returning to his trade arid be incapable of being retrained for gainful employment. Id. “Total disability does not mean an entire physical disability or absolute helplessness.” 722 So.2d at 773. This court has stated that “ ‘[gainful employment means employment similar in remuneration to that earned prior to the injury. Implicit in this is that the gainful employment sought to be restored must be “suitable.” By “suitable” we mean employment which is compatible with the employee’s pre-injury occupation, age, education, and aptitude.’” Trans Mart, Inc. v. Brewer, 630 So.2d 469, 471 (Ala.Civ.App.1993), quoting Ex parte Beaver Valley Corp., 477 So.2d 408, 412 (Ala.1985). It is the duty of the trial court to make a determination as to the extent of disability. Hamby, 722 So.2d at 773. In making that- determination, the trial court is not bound by expert testimony, but it must consider all the' evidence, including its own observations, and interpret that evidence to its own best judgment. Burden v. Huckaba, 708 So.2d 199 (Ala.Civ.App.1997). The court, in determining the extent of an employee’s disability, may also consider the employee’s subjective complaints of pain. Hamby, 722 So.2d at 773.
After reviewing the record in this case, I believe that the trial court abused its discretion in failing to find Munkus to be 100% permanently and totally disabled. Munkus was 63 years old and had completed the sixth grade at the time of the trial, and he had no additional education or vocational training. Munkus suffered injuries to his cervical region and shoulder during the course of his employment with Watts Construction; those injuries necessitated three surgeries. It is undisputed that Munkus’s work history had consisted of primarily medium to heavy labor-intensive jobs that required little or no skill. However, after the work-related accident, Munkus was placed within the sedentary-work category with a number of permanent restrictions. Dr. Ryan testified that Munkus may be disqualified from certain jobs that fall 'within his work restrictions because of his educational level. Spra-dling reported that Munkus read and performed math at a preschool level and that his scores on the Wide Range Achievement Test demonstrated that he was illiterate. She further concluded that Munkus possesses no skills for vocational alternatives and that, based on his educational background, his work history, his documented physical limitations, and his complaints of pain, Munkus is 100% vocationally disabled.
Rice also noted that Munkus had a sixth-grade education and that he had no additional education or technical training. He reported that Munkus read and spelled at a first-grade level and performed math at a second-grade level. Rice noted that Munkus was limited to the sedentary-work category and that he is incapable of returning to work as a truck-driver.
*553 I conclude that Munkus’s advanced age, his educational and employment background, and his limitation to the sedentary-work category prevents him from being able to obtain suitable employment as that term is defined in Breiver, supra, and, thus, that he is 100% permanently and totally disabled. Accordingly, I dissent.